The next case on for argument is Schouenborg v. Superintendent. Good morning, Mr. Leavitt. Yes, good morning, Your Honors. I'm Richard Leavitt. I represent Mr. Schouenborg. We're here pursuant to the grant of a certificate of appealability. I'm joined at council table by our law clerk, Laura Vengemeyer. Good morning. There's no question in this case, Your Honor, that defense counsel essentially screwed up. During trial, the complaining witness testified to a suggestive lineup proceeding. She was told that there's going to be five men standing, and you're going to have to pick one out, and why do you recognize him? The case law is clear, both from this circuit, and also from the state courts, and also from other courts that we've cited outside the jurisdiction, that it is unduly suggestive to tell a victim looking at a lineup that she is required to pick somebody out of the lineup, that's where the line is drawn. It may not be deemed error just to say that a suspect has been arrested, or even necessarily that the suspect is in the lineup. But a clear line is crossed when a witness is told that she must pick somebody out of the lineup. Well, I mean, there's some equivocation about how explicit that statement was, isn't there? Well, it was actually explicit. She said that she was told by Detective Bertelli, there's going to be five men standing, and you're going to have to pick one out, and why do you recognize him? There's no question that in one of the subsequent question and answers, she equivocated. But then, she came back very strongly when she was asked by the court, and she says, he told me to wait a little bit, and he told me to come in, and he told me there's going to be five men, and you're going to have to see all of them, and you're going to have to pick one of them out, and you're going to have to recognize him. That's what she said at page 650 of the trial record, page 80 of the appendix. In any event, there's no question that however you read this record, there was a very strong basis, an unquestionable basis under the criminal procedure law for defense counsel to move to reopen the Wade hearing, because if what she said was true, this was a unquestionably suggestive line of procedure. The state court in denying Mr. Schoenberg's 440 proceeding said, well, this was just a strategic decision. Well, quite clearly, the state court based its determination denying the 440 on a misunderstanding, to say the least, of the record, because there is not the slightest indication in this record, and the people never even argued that the failure of defense counsel to move to reopen the Wade hearing was a strategic decision, there's no evidence of that whatsoever. So the state court, in denying the 440 motion, simply did so based upon a clear misunderstanding of the record. What about prejudice? Yeah. What about prejudice? Yes, thank you, your honor. She spent a lot of time with him that evening, unfortunately.  And clearly picked him out in a photo array shortly after the offense. The lineup was shortly after that. She testified he worked at a pizzeria on Merrick Road, he did. Yeah, yeah. He was a fisherman, there were fishing poles and other things in the car. There was a bag that was identified, too. Why do we think that the outcome of the Wade hearing would have been different? Well, first, it's necessary to show a colorable possibility of a successful Wade hearing. But to directly answer your question, Judge Droney, these facts are not at all what the people represent them to be. Because the first thing that was told the night of this event was that the perpetrator was a 27-year-old Hispanic-looking white person, or white and black Puerto Rican person, or Hispanic person. There was no evidence, there was no testimony from either SV, the victim, or from her friend that whoever perpetrated this had tattoos. And she also testified- Did the friend ID the car, which was a distinctive car? Well, actually, it wasn't a distinctive car, and she didn't really ID it. She said it was a four-door Oldsmobile. And what she said was that she smeared blood all over the interior of the car. So in fact, everything- But one of the other people, not the victim, I think the male identified the car, too, as a distinctive car, right? Well, but not as a distinctive car, as a four-door Oldsmobile, assuming that that's correct. Assuming that that testimony was accurate and true testimony. But what turned out to be the case was, Mr. Schoenberg is not 27, he's 40. He's not Hispanic-looking, he's clearly white-looking. There was no blood or other forensics in the car, contrary to what SV apparently claims that she had done, smeared blood all over. So everything that was of significance turned out to be wrong. And this is what really happened, Your Honor. This is what appears to have happened. You read in the people's brief, because they highlighted this at the beginning of the brief, that a week prior, there was apparently an incident in the vicinity of the same park, where somebody, and apparently Mr. Schoenberg's car, that there was a person in Mr. Schoenberg's car, let's assume that it was Schoenberg for these purposes, approached two people and asked them if they wanted to smoke marijuana. They declined, but they took a picture of the license plate. So when this crime occurred, Detective Bertelli assumed immediately that this was probably Schoenberg's doing. So what Bertelli did was the following, and this is clear from the record of the trial and from Bertelli's testimony. He didn't bother looking to see whether or not there were other Oldsmobiles that may have been involved in this kind of event out on Long Island. He just focused in on Mr. Schoenbergers. At the photo array- White Oldsmobile too, right? White, sure, white four-door. At the photo array, because he had concluded it was Schoenberg, a white guy, he ignored the testimony of SV, the statement of SV, that it was a Hispanic-looking person, a white black person, a Puerto Rican person, and put six white people into the photo array. He then had a lineup where he suggestively told her that he's in there, you have to pick him out. And to make sure that she now changed her testimony from Hispanic-looking or Puerto Rican or white and black Hispanic-looking. He or his partner, Detective King, told her that the guy that did it is an Italian guy. So they papered over all of the inconsistencies because he had focused solely on Mr. Schoenberger and so this was essentially a fait accompli. Bertelli had decided it was Schoenberger, who cares that the person was Hispanic, who cares that we're Hispanic-looking. I'll just paper that over, I'll tell her to pick somebody out of the lineup, I'll make sure that all the people in the photo array are white, so what that there's no blood when she said that there was going to be blood. Who cares that he has tattoos all over his arms when neither SV nor her friend saw tattoos. So the question here is not whether or not he would have prevailed. The question on prejudice is whether or not he has made a colorable showing that he might have prevailed. And most respectfully, based on this evidence, there is simply no question that he's made, at the very least, a colorable showing of merit to a renewed Wade motion. Would all of what you just recited come in in the Wade motion, or would it only be, we're going to go back and look at the identification procedures that were used? Well, the question post-conviction is to look at the entire body of evidence. And if we decide to only look at what happened prior to the Wade hearing, well then there's really no issue at all. Because prior to the Wade hearing, we know that there were numerous improprieties that occurred, both with regard to how the photo array was assigned. The fact that by then, by the time of the lineup, they knew that there was no blood in the car, even though the car that was used supposedly should have shown profusely blood all over it, according to what SV told Bertelli. And numerous other facts that suggest that this, in fact, was not the car. Schoenberg was not the 27-year-old Hispanic-looking person who perpetrated this offense. So if we look only at the evidence that we knew at the time of the Wade hearing, we would have prevailed. And if we look at the entire body of evidence now, including the trial testimony, it certainly showed a colorable basis for merit. Thank you, Mr. Levitt. You've reserved two minutes for rebuttal. Thank you. Mr. Brennan? Good morning. Thomas J. Spoda, District Attorney of Suffolk County, by Michael J. Brennan of Counsel for Respondent. Good morning, your honors. May it please the court. Judge, we submit that the state court's rejection of the appellant's ineffective assistance claim was neither antithetical to a conclusion of federal law as established by the Supreme Court or a decision by the state court which differed from a decision by the Supreme Court when the two cases had identical facts. Now, I've got that out of the way. Yeah, what do you do with Mr. Levitt? What do I do? First of all, the age, 27. That's what he, the two children based their description of him being 27 years old based on what he told them at Tanner Park that day. His name, Paul, or Paulie from the Bronx, that is what they told him. He told the children on that date, the blood in the car. If you consider the testimony of Diane Allia, one of the Suffolk County forensic analysts, and Nurse Dunseith, the young girl's description of her injuries were consistent with her description of the assault. And they both found that there to have been anal and vaginal trauma which resulted in more secretion of fecal matter and slightly, some bleeding. So it's entirely possible that on the night of this event, when she's at her friend Laura's house. And she says, she told Detective Bertelli, she wiped, she found something and she thought it was blood. Not what it probably was, it's fecal matter and that's, not probably, that's what it was based upon. Nurse Dunseith and Ms. Allia's testimony that that was more prevalent. This- About something else, and that is, there seems to be an argument that it was a strategic decision by his lawyer at the time, not to seek a renewed road, I'm sorry, Wade hearing. Is, what could be the strategic reason that he didn't say after her cross-examination, we don't need, it's not a good idea to reopen the Wade hearing? Of course, as Judge Seabert noted in her decision, number one, Sarah spent a considerable amount of time with her assailant, and I'm saying in daylight, in dusk, and in the evening. That she instantaneously identified him at the photo array, which had taken place a week earlier, ten days earlier, and she had instantaneously identified the appellant at the two lineups in which counsel was present, in fact, counsel was present at both lineups. Mr. Duncan himself was present 11 months later, when the young boy, Joe, was given an opportunity to view the defendant in the lineup. So repre-counsel was there, and there was no evidence of any type of police misconduct. That is- The answer to that, there's no way we'd win the Wade hearing, so why are we asking for it? Is that your answer? That's my answer, Your Honor, yes. If I may- We've sort of come around in our jurisprudence and certainly in the scientific community generally to some form of acknowledgment how far this court has gone is hard to say, but I know we wrote a habeas decision out of the Western District of New York, I believe. Indicating that the kind of conduct that the witness testified to on behalf of the police officer is inappropriate and is suggestive and is potentially problematic. Is there- My response to that, Judge, is that this court has, in Linn, held that despite inconsistent statements made by a witness when there's simply no evidence of improper police conduct, the lineup, the mere inconsistencies by the witness does not- All right, I guess my question to you is, is it the people's position that when an officer says, there's five, six, seven guys up there, the person who did this to you is one of them, pick him out. Is that inappropriate? Detective Petelli didn't say that- I'm giving you a hypothetical, you could answer it yes or no. If he said the person who did that to you was in the lineup, that would be problematic. All right. That would be mostly problematic. We're in agreement on that. Very important, your honors, the racial, the initial evening when Sarah escapes from the defendant, from the appellant, and runs to Laura's house. The initial description of her assailant is of a white male. All right, that's the initial description that Officer Sonia Martinez gets on dispatch, and she's the first officer there. And when Sarah is describing this defendant, the issue of his ethnicity or background may have come up, and Sonia Martinez' officer specifically asked Sarah Venus about his skin complexion, and she said white. And that's what she wrote down in her scratch notes. This is a testimony of cross-examination, and that's what she went out with on her all points bulletin. Detective Petelli's initial notes on cross-examination when defense counsel asked him to go to, Mr. Detective Petelli referring to your September 16th and 17th notes, which begin with Sarah, white male, Paul. Sarah said white Hispanic, fine. She gave the basic description of the defendant, of the suspect, as did Mr. Putra. And that's what they had to go on until the formal statements were taken on the 21st and the 29th of September of that year. And by then, Detective Petelli had enough to go on where they were looking for a man who worked in a pizzeria in Merrick, who wore a bandana, who was driving a white Oldsmobile with black or blue lettering on the side, that he liked to fish, and he had shown the two children his black purse with a knife in it the day of the, which he used to cut fish. Can I just ask you this though? Yes. What's the standard? I mean, what does the petitioner have to show? That he would have won the Wade hearing, or he had to make, all he has to do is show there's a colorable chance that he might have prevailed, something like that, is it? A colorable chance, and it's our opinion that he would not have prevailed, because he had, again, these three photo opportunities, three- You see the difference, though? You said he might, you just said he would not have prevailed. There's a difference, isn't there? Yes. So which standard applies here? The colorable standard, or he would have won standard? Well, he would not have won standard. That's your view of the law? Well, that's my view of the circumstances here, Your Honor. So I'm, just to follow up on Judge Droney's question, what's, what is the standard that we apply in- Oh, I'm sorry, whether it would be colorable, that was asking you my opinion. My opinion is that he would not have prevailed at the Wade hearing. No, I understand that. But what we review it as, in terms of, I think, Mr. Levitt's argument, and of course he will correct me if I'm wrong, that if there was a colorable chance of prevailing, then he should have, he's entitled to a new trial. He's entitled to the writ. If he could have prevailed, but I don't believe that he could have. And I don't believe that Judge Braslow or the other appellate courts in the state were unreasonable in viewing that he would not have prevailed. And that the prejudice, if there was prejudice, that he could possibly have prevailed the trial, given the forensic, given the DNA evidence, giving the very solid identification, and given the fact that the two children's stories- What was the DNA evidence? DNA evidence was that, although the- There wasn't any DNA evidence, was there? Well, there was. A semen-stained shirt was found in the trunk of his car when he was arrested. The search warrant was executed on it. And he was tested, the shirt was tested, and his partial genetic profile was found on it. There were two other- There were others on that? There were two others, and one of, she could not be excluded. That was the testimony. The nurse could not, I'm sorry, the DNA expert could not testify to a statistical probability, but she did find his genetic profile on it, as well as at least two other donors, of whom Sarah, the victim, could not be excluded. So just, if I may, just to conclude, we submit your honors that error by counsel was not such that would undermine the confidence in the outcome. The adversarial process did not break down here, and we submit that the district court, Judge Seabrook, correctly denied the defendant his habeas corpus appeal based upon looking upon the totality of the evidence. Thank you, Mr. Brennan. Your honor. Mr. Levin. Yes, thank you, your honors. First, to clarify the standard issue, the issue is not whether or not we made some showing that we would have ultimately prevailed the trial, but whether or not we made a colorable showing that we would have prevailed with regard to the Wade motion itself, had it been made. I think the law is crystal clear on that. Prevailing at the Wade motion would mean knocking out the two suggested identifications. Yes, your honor. And for the question of prejudice, then, don't we need to look at whether the outcome of the trial was likely to have been different? No. No. About that evidence? No, the question is whether or not the outcome of the Wade motion would have been different. Not whether or not the outcome of the trial would have been different. My colleague makes many arguments, I know I can only respond to a few, but let me give it a try here. What if just knocking out the evidence, you're still left with a mountain minus a tablespoon full? I don't believe that that's so, but that's not the test anyway. Well, I understand that. You guys keep arguing with my hypotheticals, but don't do that, please. It can't be the law that just prevailing on a suppression motion, if there's other evidence that comes in, this goes to the issue of prejudice. Well, the court, I know, will review all the cases, and I'm confident that the court will find that the issue in this kind of case is whether or not he made a culpable basis for the granting of the Wade motion. Not whether or not he made a culpable showing that had he won the Wade motion, he would have prevailed at trial. It's simply not the test. Did she identify him in court, or would that have been tossed? Of course. I mean, of course she identified him in, well, she did identify him in court. That may or may not have been tossed, depending upon the finding that would have been made below. But again, that's not the issue. The finding that would have been made in- At a Wade hearing. But that's not the issue. The issue is whether or not he would have prevailed on the Wade hearing, which in the first instance is to keep out the lineup identification itself.  There is no DNA evidence that's meaningful in this case because the forensic expert testified that she couldn't conclude with any reasonable degree of scientific certainty that the victim's DNA was on the shirt that was found in the car. With regard to the daylight viewing of the park by SV, well, her friend JP also made the same daylight viewing in the park and couldn't make an identification. The photo array identification, well, that was done after Bertelli had determined to essentially tell her, or King, Detective King, told her that this was really an Italian guy. And then put six white guys into the photo array rather than any Hispanic looking person. And when my colleague says that she was quite clear that this was a white guy, here's what she said. She told Officer Martinez that it was a white, Hispanic looking male, and then Detectives King and Bertelli. She described a person of racial mixture, Puerto Rican, white and black Puerto Rican, and or Hispanic looking. So, and she told the SANE nurse later on that evening that the person was Hispanic. So you had Bertelli draw a conclusion, and then essentially what he did was he pigeonholed all the facts into that conclusion. And when he was having difficulty with it, what he simply said outright was the guy's Italian instead of Hispanic, Hispanic looking or Puerto Rican. So that's respectfully how this case happened. And if Bertelli were properly cross examined at a full weight hearing, I think it would come out that he manipulated the evidence in this case in order to draw a conclusion. At the very least, we've shown a colorable basis to conclude that we would have prevailed at the weight hearing. Thank you. Thank you very much. Thank you both. We will reserve decision in this case.